Ira BERNE et al., Appellants,

v.

Julian T. KEITH, Appellee.

No. 13922.

Court of Civil Appeals of Texas.

Houston.

Sept. 13, 1962.

Two Motions for Rehearing Denied
Nov. 8, 1926.

Fountain, Cox & Gaines, Joyce Cox, Winston Ellis, Houston, for appellants.

John L. Hill, W. James Kronzer, Houston, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Houston, of counsel, for appellee.

WERLEIN, Justice.

This suit was brought by appellee, Julian T. Keith, against Ira Berne and some thirty-two corporations, to recover as compensation for personal services 10.9% of the profits realized and to be realized from

a project known as Westbury project, involving the development, use and sale of three tracts of land designated as the 526 acre, 714 acre, and 430 acre tracts, generally referred to as Westbury, and alternatively for damages for denial of his alleged rights. Judgment was rendered by the court in the sum of $579,721.92, the court disregarding answers to eight issues, setting aside the finding of joint enterprise, and entering judgment for breach of oral contract for personal services. On motion for new trial the court ordered that a new trial would be granted unless a remittitur was filed in the sum of $287,620.96. Such remittitur was filed and the judgment was reduced to $292,100.96 with interest from date thereof. Appellants have assigned numerous points of error.

The oral agreement upon which Keith bases his claim is encompassed in the jury findings made in answer to Special Issues 1, 3, 4 and 5, which the trial court allowed to stand, to wit:

To Special Issue No. 1: That at the time of the meeting of Ira Berne and Julian Keith in August, 1954, Ira Berne and Julian Keith agreed with each other on the following matters: (a) That Julian Keith would invest some of his personal funds in the Westbury project; (b) That for his coming to work on the Westbury project Keith would receive an interest in the profits, if any, produced or generated therefrom; (c) That any salaries of Berne were not to be deducted in determining net profits, if any, to be produced or generated from the Westbury project; (d) That Keith's participation in the profits, if any, would extend to all of the properties comprising and which would comprise the Westbury project; (e) That as between Berne and Keith, Keith's participation in the profits, if any, produced or generated from the Westbury project would not be affected or changed by the mechanics, creation and use of corporations and companies utilized for the purpose of developing and selling the Westbury project; (f)

That Keith would work on the Westbury project until such time as it was completed and sold or sold before completion; and (g) That Keith's services could not be terminated except for dishonesty or fraud.

To Special Issue No. 3: That at the Brooks System Sandwich Shop meeting (March or April, 1956) it was agreed between Ira Berne and Julian Keith that: (a) Keith would continue to devote his services to the Westbury project until that project was completed and sold or sold before completion; (b) Keith would receive 10% exclusive of any investment interest of Keith, of the net profits generated from the Westbury project as computed at completion or sale of such project; (c) Such 10%, if any, would be figured on the total net profits, before deducting income taxes, and before deducting any salaries paid to Berne; (d) From such 10%, if any, there would be first deducted such moneys paid to Keith.

To Special Issue No. 4: That at the Brooks System Sandwich Shop meeting (of March or April, 1956) it was agreed between Berne and Keith that the 10% net profits interest, if any, inquired about in Special Issue No. 3 and the investment interest would be merged and combined to a 10.9% interest for Keith in the net profits of the Westbury project before taxes.

To Special Issue No. 5: That at the Brooks System Sandwich Shop meeting (of March or April, 1956) Ira Berne and Julian Keith agreed: (a) That Keith's participation in the profits, if any, would extend to all of the properties comprising and which would comprise the Westbury project; (b) That as between Berne and Keith, Keith's participation in the profits, if any, produced or generated from the Westbury project would not be affected or changed by the mechanics, creation and use of corporations and companies utilized for the purpose of developing and selling the Westbury project; and (c) That Keith's services could not be terminated except for dishonesty or fraud.

The jury, in answer to Special Issue No. 2, found that it was possible to perform the agreement inquired about in Special Issue No. 1 within one year from the making thereof; and in answer to Special Issue No. 6 the jury found that it was possible to have performed such agreements as they may have found Ira Berne and Julian Keith made at the Brooks Sandwich Shop, within one year from the making thereof.

The first question presented for our determination is whether the trial court erred in refusing to enter judgment for appellants upon the ground that Keith's claims under the pleadings, evidence and jury findings are to an interest in land, or to a right in land or the proceeds thereof, which cannot be established or enforced upon an oral agreement. Keith takes the position that he alleged that his claim to profits was stated only and solely as the basis for measuring his compensation for personal services, and that he has neither pleaded nor established a claim to an interest in land.

In his first amended original petition Keith alleged that Berne promised him that he would be given a larger percentage of the Westbury project over-all profits if he would make a personal investment of $5,000.00; that subsequent to such investment being made by Keith, and which investment was part and parcel of the over-all employment arrangements, it was agreed between the said parties that in full compensation for Keith's services in connection with their joint business venture, in addition to his 1% investment percentage, Keith would be and become entitled to 10% of the profits, before income taxes, generated from the Westbury project, less any salary and bonuses paid Keith by Berne from time to time. He also alleged that such 10% interest would be applicable before any investment percentages were paid, making his total percentage 10.9%, and also that the 10.9% would be paid him on any salaries or personal expenses withdrawn by Berne.

It is clear that the relationship between Berne and Keith was that of employer and employee. Keith went to work on October 1, 1954. He testified that Berne allowed him a drawing account of $600.00 per month to begin with, and that he was to work on a percentage basis which was the only basis Berne was willing to employ him on. The trial court in entering judgment expressly found that the judgment entered is based upon a breach of an oral contract for personal services with compensation therefor being measured by a 10.9% interest before federal income taxes in the profits of the project, and that such 10.9% interest is based upon plaintiff's 1% investment interest as merged and combined with a 10% interest in such manner as to result in a total of 10.9% interest, all as found by the jury in response to Special Issues Nos. 3, 4, 5 and 6; and that the judgment entered was in personam only for damages, with no relief being granted to plaintiff by way of impressing any form of constructive or resulting trust in respect to any of the lands described in plaintiff's first amended original petition or upon funds representing money from the sale of such lands, and that all relief sought by plaintiff in the nature of any declaration of rights in respect to such project or lands not specifically granted was specifically denied. If the trial court's conclusions and judgment are supported by the pleadings, evidence and findings of the jury, the contract would not give Keith an interest in land or such interest in the proceeds or profits therefrom as might be construed as an interest in land within the Statute of Frauds, Art. 3995, Subd. 4, Vernon's Annotated Texas Statutes.

■ Appellee does not assert any interest in the lands comprising the Westbury project. He claims only compensation for personal services and damages for breach of contract, and contends that he is entitled to recover 10.9% of the net profits generated and growing out of the development project. The oral contract as found by the jury was substantially pled by appellee and his testimony supports the jury findings. An analysis of such findings by the jury

based upon all of the evidence adduced does not indicate that the parties intended by the oral contract to vest in Keith any interest in the lands comprising the Westbury project. The cases relied upon by appellants, in support of their contention that under the oral contract in question Keith's claims are to an interest in land or to a right in the land and the proceeds therefrom, are factually inapplicable to the present case. Most of such cases involve oil, gas and mineral leases and royalties in which the interest claimed was measured by the production of the land whether payable in kind or money. It is, of course, well settled that the right to royalty from oil production constitutes an interest in land. In Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741, our Supreme Court held:

"Sound principle, supported by the highest authority, goes further and compels us to accede to the proposition that dealing with oil and gas or dealing with solids in place, like sulphur, lignite, salt, coal, or lime, the lessor owning the entire fee-simple title to the land, and his assigns, who have been careful to secure to themselves, their heirs or assigns (by exception or reservation or by contract for 'having' or yielding or paying, or for delivery, or by what-not similar contractual clause), the right to a portion of the proceeds or profits derived from the lessee's or his assigns' authorized sale of the minerals, throughout the duration of a determinable fee, which may be perpetual, have and own a fee-simple interest in land, or at least have a right belonging or appertaining to the horizontal strata of the land in which the minerals are embedded."

Appellants rely heavily upon Dietrich v. Heintz, 44 Tex.Civ.App. 602, 99 S.W. 417, writ ref. We think that case is distinguishable from the instant case in that the claim of the employee in that case was that his employer verbally promised him that she would give him an interest in the premises to the extent of $4,000.00 which he would receive from the sale of the lot. He did not sue for the value of his services, and if he had done so, his action would have been barred by limitation. The court held that it was obvious that the claim was based upon the sale of an interest in land to the extent of $4,000.00, and was therefore void. Frazier v. Hanlon Gasoline Co., Tex.Civ.App., 29 S.W.2d 461, is also distinguishable in that it involved a profit a prendre or the right to take something out of and from the soil.

We think one or more of the following elements or attributes of the oral agreement in question distinguish it from the instruments or agreements upon which claims were based in the cases relied upon by appellants, and support appellee's contention that the claims asserted by him are not to an interest in land: (1) The oral agreement does not expressly or by necessary implication give appellee an interest in the land or in the proceeds from the sale of lands or any part thereof; (2) The liability for payment of appellee's compensation for services rendered and to be rendered is that of Berne personally whether acting individually or as the alter ego of the numerous corporations, some of which took title to the land; (3) Keith was to share in the net profits of a large development project or business in payment for personal services. He was paid a salary and given bonuses and/or had a drawing account. He was to be paid 10.9% of the net profits of the entire project when completed and sold or sold before completion as his total compensation, from which would be deducted salaries, bonuses and/or draws previously received by him. (4) Keith could be discharged at any time for dishonesty or bad faith. There is nothing to show that he would be entitled to any profits if he were discharged for good cause prior to the completion or sale of the project. (5) Keith claims no interest in the land as such nor does he seek to recover anything therefrom in the nature of profits a prendre or any usufruct from the land in kind or measura-

ble in money or products. (6) Keith could not require appellants to sell the land or any part thereof, nor could he interfere with appellants' sale of the land for any price or under any conditions, nor could he demand any profits from the project prior to the completion thereof or sale before completion.

Appellee has cited a number of authorities to the effect that an oral agreement to share profits arising from the purchase and sale of real estate is not a contract for a transfer or assignment of an interest in real estate. See Martin v. Morrison, Tex. Civ.App., 260 S.W. 893, 894, writ dism.; Frank v. Gaffney, Tex.Civ.App., 2 S.W.2d 885, 887, writ dism.; Jowell v. Carnine, Tex.Civ.App., 32 S.W.2d 511, 512, error ref.; Carothers v. Creighton, Tex.Civ.App., 101 S.W.2d 631; Gill v. Smith, Tex.Civ.App., 233 S.W.2d 223, writ ref., n. r. e.; Le Bus v. Le Bus, Tex.Civ.App., 269 S.W.2d 506, writ ref., n. r. e.; Newton v. Gardner, Tex. Civ.App., 225 S.W.2d 598, writ ref., n. r. e.

In Eads v. Murphy, 27 Ariz. 267, 232 P. 877, the court clearly announced the majority rule covering an agreement to share profits from the purchase and sale of land as follows:

"While there is some conflict of authority, yet the overwhelming weight is to the effect that a parol partnership agreement or joint enterprise entered into by two or more persons, for the purpose of purchasing and selling real estate or interests therein for speculation, the profits to be divided among the parties, is not within the statute of frauds relating to the sale of lands or an interest therein, and that such an agreement may become effectual and suit maintained thereon, though not in writing. In fact, while the doctrine in Hoge v. George, supra [27 Wyo. 423, 200 P. 96, 18 A.L.R. 469], is supported in 29 states as well as England and Canada, the contrary rule is upheld by only 6 states and a few federal decisions, and, even in two of those, where

the agreement has been fully executed so that nothing remains, but the division of the profits, as alleged in this case, it is held not to be within the statute."

■ Appellants contend that the instant case is distinguishable from the cases cited by appellee in which the contract was for the purchase and sale of land, since at the time of the original agreement between Keith and Berne in August, 1954, Berne had already acquired an undivided one-half interest in the 526 acre tract, and at the time of the Brooks Sandwich Shop agreement in 1956, various corporations controlled by Berne owned that part of the land comprising the Westbury project which at such time had not already been sold or conveyed to Berne. The validity of the distinction seems doubtful since the majority rule is not based upon the theory of a trust relationship but, in the main, upon the theory that an agreement to share in the profits of contemplated speculative deals in real estate simply does not involve the transfer of real estate, or an interest in real estate, within the meaning of the Statute of Frauds. See Annotations, 95 A.L.R. 1242, 1243. So in the instant case appellee is not seeking a transfer of any interest in the lands belonging to Berne or anyone else. He is seeking an accounting of a share in the profits as compensation for services rendered in a project involving speculation in real property which he asserts became due him upon completion of the project or upon a breach of the agreement by Berne.

The distinction which appellants undertake to make, however, is discussed and recognized by the Supreme Court of Virginia in Burgwyn v. Jones, 113 Va. 511, 75 S.E. 188, 41 L.R.A.,N.S., 120, in which it is held that an oral agreement creating a partnership and giving the partners an interest in real estate owned by a partner at the time of the formation of the firm, is an agreement for the sale of real estate within the Statute of Frauds. In that case the court stated that if appellant acquired an

interest in ·appellee's lot by virtue of the contract it attached upon the contract being made. The court stated, however, that upon such question the authorities were not agreed. See 49 Amer.Jur., § 220, p. 546, where it is stated:

"Some courts, however, limit the rule to an agreement for the future purchase and sale of real estate for speculation, to the exclusion of an agreement to become interested in and to share the profits from lands already purchased and owned by a member or members of the firm when the partnership is formed. Other authorities make no distinction on this ground."

We think the instant case is distinguishable from the Burgwyn case, and that the facts herein are more analogous to those in the case of Atlantic Coast Realty Co. v. Robertson, 4th Cir., 240 F. 372. The court in the Robertson case distinguished it from the Burgwyn case, and held that the contract by which the defendant, an owner of land, gave plaintiff an agency to sell the land, plaintiff to make advancements for development, advertising, etc., and to receive as compensation one-half of the net profits received from the sales above the fixed value placed upon the lands, did not give plaintiff any interest in the land which would bring the contract within the Statute of Frauds.

In the instant case there is no partnership agreement or community of profit. Keith has no interest in the profits as profits, as distinguished from an interest therein as compensation. Tanner v. Drake, Tex.Com.App., 124 Tex. 395, 78 S.W.2d 162. Nor is he required to share in the losses of the project, although he might receive no percentage of profits if it failed and might have to refund his advances or "draws". Paggi v. Quinn, Tex.Civ.App., 179 S.W.2d 789, writ ref., w. m. Where one buys land and agrees that another shall sell it for compensation to be derived from a share of the profits, such agreement does not constitute a partnership. Frank v. Gaffney, supra. On motion for rehearing in the case of Parriss v. Jewell, 57 Tex.Civ.App. 199, 122 S.W. 399, error ref., recovery was permitted in the sum of $1500.00 from the proceeds of the sale of land which was already owned ' by the other party, since the contract was for the payment of money and not for the sale of land. See also Atlantic Coast Realty Co. v. Townsend, 124 Va. 490, 98 S.E. 684, which is in accord with the case of Atlantic Coast Realty Co. v. Robertson, supra. To like effect see Wicks v. Knorr, 113 Conn. 449, 155 A. 816, in which the court stated: "Knorr and Tobin were not joint adventurers as regards the Campo Hills development. The agreement being merely to divide profits, it was not within the statute of frauds, even though these were to be realized from real estate transactions." See also Manget v. Carlton, 34 Ga.App. 556, 130 S.E. 604.

In Bowyer v. Beardon, Tex.Com.App., 116 Tex. 337, 291 S.W. 219, opinion adopted by the Supreme Court, the court held in answer to a certified question that the "owner of land under rental to another may, upon sale of such land, reserve by verbal agreement the rentals thereafter to become due. This is a segregation by mutual agreement of the rentals from the land. Such segregation does not involve the statute of frauds in any way."

We think the fact that after this suit was filed, appellee sought in an ancillary proceeding to prevent the transfer of certain assets of one of appellant's corporations to another corporation, is not controlling in any way since, at such time, whatever rights appellee had under the contract sued upon had already accrued and he was entitled to his percentage of the net profits as compensation. Basing our opinion upon the entire record, we have concluded that the oral agreement between appellant and appellee as pleaded and as found by the jury does not fall within the Statute of Frauds of this State.

Appellants assert that the court erred in refusing to deny Keith recovery on the ground that the existence of damage is speculative. Although it is conjectural as to the amount of future profits that will ultimately be realized, we think there is sufficient evidence to support a finding that in all reasonable probability profits will ultimately be realized upon completion and sale of the Westbury project or sale before final completion. In Southwest Battery Corporation v. Owen, 1938, 131 Tex. 423, 115 S.W.2d 1097, the court said:

> "The courts draw a distinction between uncertainty merely as to the amount and uncertainty as to the fact of legal damages. Cases may be cited which hold that uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery. A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages."

See Adams v. Hood County Sand & Gravel Company, Tex.Civ.App.1962, 354 S.W.2d 593.

In the instant case it was proved that large profits had been produced or generated by the project from the time of its beginning in 1954 until the date of trial in February, 1961. There was nothing to show that conditions had so materially changed as to indicate future profits would not be realized. It is true that Berne painted a rather bleak picture of the future, but his expressed amazement when asked if he would sell all the remaining property for the indebtedness against it is not consonant with such picture.

Keith admitted that the business of building houses for sale was speculative and that such observation would apply to Westbury except for the fact that the water district improvements in Westbury had cost over $4,500,000.00. He said that

what the profits will be would probably be conjectural but he did not testify to any uncertainty as to the fact that profits would be generated. The house building business, about which he was testifying, was only a part of the over-all project of developing an addition, selling lots both retail and wholesale, and establishing a large and attractive community center for stores. Keith's projections of future sales and future profits that would in his opinion be produced, while largely speculative as to the amounts of profits that would be generated, strongly support appellee's contention that there is no uncertainty as to the fact that the project which had produced large profits during the preceding several years, would continue to show profits. Appellants' witness Farb testified that he had no way of determining what Keith's share of the profits would be over a twenty year period. He testified that we could guess what they would be, and "We might estimate them." He also testified, "I think we could determine that there might be a profit as opposed to a loss. But if you asked me could we determine the exact profit, the answer is no." He further stated that he could not say whether or not there would be any profits from Westbury on a "guaranteed basis."

The evidence indicates that Westbury will have been completed and sold or sold before completion in much less time than twenty years. We think the evidence also amply shows that barring some extraordinary crisis or catastrophe it is reasonably certain that the project will show a substantial profit at the time of its completion. This conclusion is further supported by the fact that the business is a going one and that more than $1,500,000.00 past profits had been made.

The law is well settled that damages as lost profits may be recovered where there is an established business that has been making profits at a time not too remote. Southwest Battery Corpora-

tion v. Owen, supra; Rios v. Lowenfield, Tex.Civ.App., 289 S.W.2d 332, writ ref. n. r. e.; Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340; Richker v. Georgandis, Tex.Civ.App.1959, 323 S.W. 2d 90, writ ref. n. r. e. Under these authorities we are of the opinion that the court properly submitted the issue covering lost profits from the completion and sale or sale before completion of the Westbury project. We have examined the cases cited by appellants, and find nothing in them that militates against the rule as enunciated by our Supreme Court or against the recovery of profits in the instant case.

Appellants have allotted more than 100 pages of their brief to their contention that the court erred in holding that there is at law evidence to support appellee's claims and the jury's findings of contract and in refusing to hold that the jury findings of contract are against the overwhelming weight and preponderance of the evidence and manifestly unjust. We have read the statement of facts consisting of more than 2500 pages and have concluded that we cannot say that the jury findings are not supported by any evidence or that they are against the great weight and preponderance of the evidence. Keith testified very definitely as to the agreement he had with Berne in 1954 and also as to the agreement reached in 1956 in Brooks Sandwich Shop. With respect to such agreements it is largely Keith's word against that of Berne since no other parties were present at the time either agreement was entered into. It is true there is much conflicting evidence, but there is a thread running through the record and the testimony of Berne as well as other witnesses which at certain points tends to corroborate Keith's contentions, at least in part, with respect to the alleged oral agreements upon which he bases his suit. The jury had all of the evidence before it and resolved the conflicts in favor of Keith. The trial court, after hearing all of the evidence and observing the attitude and demeanor of the witnesses, refused to set aside the jury findings on the ground of insufficient evidence to support them. We cannot say that the court erred.

One of the main points of disagreement between the witnesses was as to when Keith and Berne came to an agreement with respect to the percentage of net profits which he was to receive. Keith testified that at the Brooks Sandwich Shop meeting in March or April, 1956, they agreed that the 10% net profits and the investment interest owned by Keith would be merged and combined into a 10.9% interest for Keith in the net profits of the Westbury project before taxes. Berne, on the other hand, contended that such agreement was not made until in August, 1958, contemporaneously with their efforts to arrive at and enter into a written agreement reflecting their arrangement. We think Keith's testimony in such connection is corroborated by that of John Crooker, Jr., and also by Berne, who testified as follows:

"Q Did you mention the price of 10% to Mr. Keith at Brooks Sandwich Shop?

"A I mentioned the figure 10%. I don't call it a price.

"Q You mentioned it. He didn't?

"A That's right."

Mr. Berne admitted that he had told Mr. Westheimer that he had had some discussion with Mr. Keith about a percentage of the profits in Westbury as far back as the year 1956. There is also in evidence a letter dated July 22, 1958 addressed by Berne to Keith with respect to the development and/or building program of Berne and his companies in or near New Orleans, Louisiana. In such letter he confirmed their understanding to the effect that Keith was to have no participation in the New Orleans activities and no additional compensation for his services, " * * * it being understood that the arrangements which we have with reference to your services for the

Westbury development in the City of Houston, Texas, will also be payment in full for your services rendered and to be rendered by you in connection with the above referred to New Orleans program." This letter is significant because of the fact that it preceded the negotiations made later in 1958 with respect to a written contract. Without undertaking to quote further from a very voluminous record, it will suffice to say that basing our opinion upon the entire record, we have concluded that the findings of the jury with respect to the contractual relations of the parties are not against the great weight and preponderance of the evidence. In re King's Estate, 150 Tex. 662, 244 S.W. 2d 660; Tudor v. Tudor, 158 Tex. 559, 314 S.W.2d 793; Dyer v. Sterett, Tex.Civ.App., 248 S.W.2d 234, writ ref. n. r. e.

■ We think there is no merit in appellants' contention that Keith's investment interest is still in effect because it is an interest in land that could not be divested without a written instrument. Defendant's Exhibit 16, which appellants assert gives Keith 1% interest in the lands comprising Westbury, is not a memorandum signed by Berne and cannot be construed as giving Keith any interest in the land as such. The exhibit is merely a letter addressed by Keith to Berne confirming the understanding between the parties that the $5,000.00 invested by Keith in Realty Funding Company would give him a 1% of the profits earned by the Westbury group of companies. This letter was not signed by Berne in the space provided for his acceptance, and even if it had been, it would not be a sufficient memorandum evidencing a sale of an interest in land but merely an agreement with respect to profits earned by the Westbury group of companies. Moreover, Berne testified with respect to the $5,000.00 investment made by Keith, that he did not give him a 1% interest in the subdivision for his $5,000.00 but agreed to give him 1% of the profits, after taxes, made by the project. This 1% of the profits was merged with the 10% interest in the profits by the agreement in March or April, 1956 at Brooks Sandwich Shop,

thus giving Keith a 10.9% interest in the net profits of the project before taxes.

■ Appellants next complain that Keith's claims and the jury's findings are too vague and indefinite to create a contractual obligation and particularly that there is a complete absence of testimony of any obligation by Berne to sell all or any of the land, or to sell at any specified time, and hence an absence of any definite obligation with respect to the completion and sale of the property and the payment of profits. We do not agree. The fact that the properties were owned by Berne and that Keith and the other "investors" were to participate only in the profits at the completion of the project or when sold, does not render the agreement too indefinite or affect the obligation. In Sapphire Royalty Co. v. Davenport, Tex.Civ.App., 306 S.W.2d 202, writ ref. n. r. e., this Court upheld an employment contract "for such period of time as said leases shall be operated and held by the assignee hereunder, or those holding by, through or under him." It is true that the project might be completed in a short period of time or that its completion might be postponed for years. Where no time is specified for the completion of a project, ordinarily a reasonable time would be implied. Smith v. Lane, Tex.Civ.App., 236 S.W.2d 214. In Palmer v. Katz, Tex.Civ.App., 210 S.W.2d 451, writ ref. n. r. e., the court stated in substance that the failure of an executory contract to state the time within which it is to be performed does not render it void for uncertainty, since it will be implied that performance is to be within a reasonable time; nor is a contract fatally indefinite because it does not specify a time presently definite for its termination. The court further stated:

"The same degree of certainty is not required in an action for damages as is required to warrant a decree of specific performance. * * * 'A contract is sufficiently definite and certain if it leaves no reasonable doubt as to what the parties intended and as to the spe-

cific thing that the Court is called upon to have performed. Absolute and positive certainty is not required; reasonable certainty is sufficient.'"

The cases cited by appellants in support of their contention that the agreement was too indefinite are factually distinguishable from the instant case. Clearly the contracts in Gordon v. Emerson Shoe Co., Tex.Civ.App., 242 S.W. 791, and in Staley v. Harvey, Tex.Civ.App., 226 S.W.2d 897, writ ref. n. r. e., relating to the future delivery of personal property, were too indefinite and unenforceable for want of consideration and mutuality. In the instant case the agreement was for the payment of a percentage of profits produced or generated from a specific project and supported by a consideration and mutuality of consent and obligation. In this respect the agreement is unlike that in Yerion v. Allison, Tex.Civ. App., 242 S.W. 270, cited by appellants, in which it was held that "agreements" to do certain things " * * * until we could get some money out of the oil game and put us both in good shape" and " * * * assist in tiding over defendant's financial difficulties" furnished no measurable bases to determine either " * * * how much money should be raised to satisfy these terms of the agreement" or to " * * * say with any certainty just what the plaintiff could be required to do in order to fulfill the obligation which he thus assumed."

Appellants' next contention involves the no-evidence and insufficiency-of-evidence rules in respect to the jury finding of profits. Appellee's first cross-point of error complaining of the trial court requiring a remittitur will be considered in connection with appellants' contention. The record with respect to profits both past and future is confusing. Such confusion is in part due to the use in the trial court of a blackboard upon which various figures were written, changed, added and subtracted without sufficient explanatory testimony of record to apprise this Court of the respective contentions of the parties or the results reached.

Thus the jury and the trial court had before them evidence or explanatory data which this Court cannot precisely appraise.

Special Issue No. 25 in effect inquires as to the present value of the total net profits which will in reasonable probability be ultimately realized upon completion and sale of the Westbury project or sale before final completion, without deduction or allowance of any salaries or compensation to Berne paid or to be paid, any federal income taxes paid or to be paid by Berne or any of the named defendant companies, or any withdrawal by or conveyance to Berne of any of the properties that theretofore constituted any part of the 1700 acres conveyed by Joseph and George Meyer. The jury answered: "$7,119,465.00."

In trying to determine whether the jury finding is supported by sufficient evidence and also whether the trial court properly required a remittitur of approximately one-half of the amount found by the jury, we are confronted with a very difficult and complex record and much conflicting testimony. There is evidence that an audit of appellants' books and records by an impartial auditor would have cost some $20,000.-00. Such an audit was not made.

Counsel for appellee had requested the jury to find $7,119,465.00 past and future profits and had argued that there was $2,-316,900.00 past profits and that Keith's projection for future profits was $4,802,565.00. The jury was not requested to find separately past profits and future profits. We think there is evidence that will support findings of both past and future profits. The difficulty is in determining the amount of past profits and the amount of future profits that in all reasonable probability would be realized. Appellee's witness Cruikshank, who was given an opportunity to examine appellants' income tax returns and books, testified from such books and also from reports made by other persons. He tabulated from the tax returns income of certain of the defendant companies and supplemented the income of such companies to

December 31, 1960 by figures taken from the companies' records kept on IBM machines.

Cruikshank added up for company income and Berne's personal income a total of $3,197,817.74. From this there would have to be deducted, according to our calculations, inter-company profits and various other items aggregating more than $1,000,000.00. We think the evidence would warrant a finding of approximately $2,000,000.00 past profits, and certainly as much as $1,570,000.00, to which amount Beerman had reduced by spot check Cruikshank's determination of taxable income as shown by tax returns.

In our opinion Keith's projection of future profits in the sum of $4,802,565.00 is out of line and not supported by the evidence. He testified to certain recent sales based in part upon hearsay evidence, and used the price scale of individual lots and not the price of substantial bulk sales, three of which (one involving 100 lots) had been made in 1960. He testified that he would guess 250 or 300 lots were sold last year, but it was just a wild guess and he had no way of knowing. In estimating profits on the future sale of 939 unsold paved lots he made no deduction for paving costs, although it was shown that paving costs on any lot may not be deducted until the lot is sold. The paving costs of such lots at $600.00 per lot would aggregate $563,400.00. Keith also included in his projection a filling station at $62,000.00, saying he did not know of its sale for $26,000.00. He valued the other filling stations at the same amount or more than $62,000.00. He admitted that 15 lots in Westbury Sections 1 and 2, which he had valued at $2,940.00 per lot, had been on the market for sale for 5 or 6 years without a buyer being found.

It is our view, based upon the evidence, that not only the filling stations but other tracts were given greatly inflated values by Keith. Appellants contend that another check of such inflation is furnished by the alleged fact that 66.5 reserve acres had been sold for $945,313.00 or $14,203.00 per acre, whereas Keith projected the value of the balance of 73.7 acres at $2,837,000.00 or $38,493.00 per acre. Appellants also point out that the James appraisal of the 26 acres in Westbury Square, Reserve D, at $1,300,000.00, a figure which Keith used, was an inflated valuation as shown by the fact that the 1956 Weingarten sale was at $12,300.00 per acre, and on such basis the 26 acres would have been worth at that time when Berne had already had the title a year, only $321,242.00, and further by the fact that in 1958 said Reserve D was valued by Berne at $400,000.00. Furthermore, Keith allowing no paving costs for the reserves.

We think that there are other considerations that were disregarded by Keith in his so-called projection of future profits. It seems fairly certain that a large number of the most desirable lots had already been sold as well as the larger part of the Reserves, and that the unsold lots and some of the unsold Reserves had been on the market for years without buyers. Berne's accountant Beerman testified that he didn't believe the project had made any profits since August of 1959, and that since December 31, 1960 the corporations in Westbury Square had lost money and the corporations on Cruikshank's list had lost about $40,000.00 in January and also in February, and were probably losing $1,000.00 per day during the time of the trial. Berne also testified that all of Reserve E had been sold, thus eliminating on that item $11,282.00 from Keith's projection.

In an effort to determine what the project would ultimately realize in profits, the cost of the property and the indebtedness against the same must also be considered. At the time of the trial the defendant corporations owed secured loans of $3,485,819.38, exclusive of interest. The companies' money was largely invested in houses which were moving quite slowly. Only one house was sold in January, 1961, and the January expenses of the companies totaled $93,417.00, and the companies' eight months' expenses amounted to $551,084.00, and during the

past year the building operations showed a loss. Furthermore, we find no evidence of any allowance of discount in Keith's projection of future profits to obtain the present value thereof.

■ It would unduly extend this opinion, which is already too long, to discuss further evidence with respect to past and future profits. It is our view that the amount awarded is not supported by the evidence and that the trial court was warranted in requiring the remittitur. We cannot say that the evidence would warrant damages in a larger amount than that allowed by the court, but we think it will justify such allowance, and that the amount over the damages allowed should be treated as excess. The trial court had before it all the evidence, including the blackboard evidence or data not adequately supplied this Court, and concluded that the amount found by the jury was influenced by improper considerations and was the result of passion and prejudice, and required the remittitur in question. This Court, in the light of all the facts and circumstances, cannot say the trial court's order of remittitur was manifestly unjust. Flanigan v. Carswell, 1959, 159 Tex. 598, 324 S.W.2d 835.

■ Appellants' contention that the trial court should have granted a new trial because the verdict was tainted with passion and prejudice has given us some concern. The law is well settled that if the verdict is tainted with passion and prejudice it should be set aside and a new trial granted. It will be noted that the finding by the court of passion and prejudice is in connection with the amount of the verdict, the court saying that the award of damages is excessive and manifestly too large. We find no evidence that would warrant a finding that the entire verdict has been influenced by improper considerations or was the result of passion and prejudice. We do not think the trial court intended to find that it was so influenced since if the trial court had done so, it undoubtedly would have set aside the verdict and granted a new trial. It is our view

that the trial court merely meant to say that the amount of damages awarded by the jury in itself indicated that the jury was influenced by improper considerations, or passion or prejudice, without any extraneous evidence thereof, and that the verdict was manifestly too large and excessive to the extent found by the court.

In Dallas Railway & Terminal Co. v. Farnsworth, 1950, 148 Tex. 584, 227 S.W.2d 1017, the court said:

"* * * The amount of the verdict itself, when considered in the light of the evidence in the record, may be enough to convince the Court of Civil Appeals that it was the result of passion or prejudice or other improper motive or was in disregard of the evidence. In our opinion there need not be extraneous proof of passion or prejudice on the part of the jury. Indeed, it would be in many cases very difficult and often impossible to make that proof. The foregoing conclusions find support in Judge Martin's opinion, adopted by the Supreme Court, in World Oil Co. v. Hicks, 129 Tex. 297, 103 S.W.2d 962."

■ The power of the trial courts and that of the Courts of Civil Appeals to determine initially whether a remittitur is proper are apparently the same. Under Rule 328, Texas Rules of Civil Procedure, it was not necessary for the trial court in the instant case to find that there was any passion or prejudice on the part of the jury as a prerequisite to requiring the remittitur, although the trial court possibly relying on certain early cases, may have thought otherwise. See Galveston, H. & S. A. Ry. v. Hynes, 1899, 21 Tex.Civ.App. 34, 50 S.W. 624, writ den. In Wichita Valley Ry. Co. v. Williams, Tex.Com.App.1926, 116 Tex. 253, 288 S.W. 425, the court quoted with approval the following statement of Justice Yantis in Wilson v. Freeman, Receiver, 108 Tex. 121, 185 S.W. 993:

"'True, it is difficult to ascertain the amount of the excess, but this difficulty arises in most cases of excessive ver-

dicts. For instance, if a verdict is excessive on account of the passion and prejudice of the jury, aroused by inflammatory speech, it is difficult, and generally impossible, to ascertain, with accuracy, what portion of the verdict was assessed because of the influence of inflammatory speech, and what portion of the verdict was based on the proper elements of damage, legally recoverable; * * * All the Court of Civil Appeals can do, and all that is required of it to do, by said statute, is to exercise its sound judicial judgment and discretion in the ascertainment of what amount would be reasonable compensation for the injury sustained, and treat the balance as excess.' "

This decision indicates that even if the excess in the award is due to prejudice or passion, it may not be necessary to grant a new trial. In the instant case is is our view that there is nothing to indicate that either the jury or the trial court was moved by improper considerations regarding the findings upon which the trial court based its judgment with respect to liability. We are of the opinion that the amount awarded appellee after the remittitur was filed is, under all the evidence, reasonable and adequate compensation for damages sustained by him.

Appellants contend that recovery should be denied Keith because Berne did not violate any obligation owed Keith. We think the answers of the Jury to Special Issues Nos. 14 and 20, inclusive, are supported by ample evidence and establish a denial and renunciation by Berne of Keith's contract and an anticipatory breach thereof. It is well settled that an anticipatory breach of contract is recognized in Texas. Preston v. Love, Tex.Civ.App.1951, 240 S.W.2d 486, and authorities cited.

We have carefully considered appellants' other points of error and overrule the same.

The judgment of the trial court is affirmed.